# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 49233

| | | |
|---|---|---|
| **DENNIS NELSON and LINDA NELSON,** | ) | |
| | ) | |
| Petitioners-Respondents, | ) | **Boise, May 2022 Term** |
| | ) | |
| v. | ) | **Opinion Filed: September 16, 2022** |
| | ) | |
| **STEPHANIE EVANS and BRIAN EVANS,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| Respondents-Appellants. | ) | |

Appeal from the Magistrate Court of the First Judicial District, State of Idaho, Kootenai County. James Combo, Magistrate Judge.

The decision of the magistrate court is <u>reversed,</u> and the case <u>dismissed</u>.

Amendola Doty & Brumley, PLLC, Coeur d'Alene, for appellants Stephanie and Brian Evans. Thomas M. Knoebber argued.

Lake City Law Group, PLLC, Coeur d'Alene, for respondents Dennis and Linda Nelson. Erik P. Smith argued.

_____

STEGNER, Justice.

This case concerns the rights of grandparents to maintain a relationship with their grandchildren. In 2017, Dennis and Linda Nelson, the maternal grandparents of C.E., S.E., and A.E., filed a petition in Kootenai County magistrate court relying on Idaho Code section 32-719 to establish visitation rights after Stephanie and Brian Evans, the granddaughters' parents, terminated contact between the children and the grandparents. Although the magistrate court initially dismissed the petition in its entirety—a decision which was affirmed by the district court—this Court reversed the dismissal, concluding that "Idaho Code section 32-719 does not restrict when a grandparent may petition a court for visitation rights" and that "there [wa]s a genuine issue of material fact as to whether the Evanses' decision to terminate all contact between the Nelsons and their children was in their children's best interests." *Nelson v. Evans*, 166 Idaho 815, 306, 308, 464 P.3d 301, 820, 822 (2020) ("*Nelson I*").

On remand to the magistrate court, the Evanses moved for a determination that Idaho Code section 32-719 unconstitutionally interfered with their fundamental parental rights. The magistrate

1

court denied the motion, and the matter proceeded to trial. After a three-day trial, the magistrate court found that, while the Evanses were fit parents, their decision to terminate all contact between the children and the grandparents was not in the best interests of the children. However, the magistrate court also found that Linda's actions on the whole had not been in the best interests of her granddaughters and that her actions had undermined the Evanses efforts to parent their children. The magistrate court nevertheless imposed a visitation schedule. The magistrate court ordered that the Nelsons attend counseling to address the issues it identified before the Nelsons could exercise their visitation award. This appeal followed. For the reasons discussed below, the magistrate court's visitation schedule is vacated, and the case is dismissed.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Stephanie and Brian Evans have three daughters: C.E., S.E., and A.E.[1] The family previously resided in Irvine, California until 2015, when they moved to Idaho. Stephanie's mother and adoptive father, Linda and Dennis Nelson, also resided in Irvine and still do.[2] C.E. was born in 2006, S.E. was born in 2008, and A.E. was born in 2011.

It is undisputed that the Nelson and Evans families were close and that the Nelsons once had a close relationship to their granddaughters. However, the nature of the relationship is heavily disputed by the families. When Stephanie and Brian announced their plans to marry, Linda did not approve of the relationship. Linda disapproved so strongly that she and Stephanie did not speak for an entire year leading up to the wedding. Just days before her daughter's wedding, Linda capitulated and agreed to attend. After the granddaughters were born, the Nelson and Evans families typically spent several days a week together while the girls were young, as Linda insisted on spending substantial time taking the girls on "playdates." The Nelsons and Evanses also frequently took vacations together to various Caribbean locations, which the Nelsons often paid for.

Stephanie, in particular, had reservations about the amount of time the Nelsons insisted on spending with the grandchildren. Stephanie testified that she and Linda have a "codependent" relationship, and that Linda manipulated Stephanie into getting what she, Linda, wanted. Stephanie attempted to establish boundaries with the Nelsons but would often face some form of

---

[1] The Evanses will be referred to by their first names.
[2] The Nelsons will also be referred to by their first names.

psychological punishment from Linda, such as emotional withholding, crying, and being made to feel guilty if Linda did not get her way. Stephanie admitted that she would give in to Linda to keep the peace. Any time the Evanses set boundaries for the girls' playdates, they would be ignored by Linda, in particular, who would consistently bring the girls home later than requested by the Evanses and would make statements such as "Wasn't it worth it, girls?" in the presence of the Evanses.

Linda would often take the girls on extravagant playdates to places like Disneyland, Legoland, SeaWorld, outdoor malls, and other theme parks in southern California. The girls typically returned home with items the Nelsons had purchased for them during the playdate. Stephanie and Brian asked the Nelsons to refrain from spending so much money and to instead go on more simple playdates such as to parks; however, these requests were frequently ignored. The Nelsons seemed intent on spoiling the grandchildren contrary to the expressed wishes of the Evanses.

Stephanie consistently stated that she had a difficult time saying no to Linda because of Linda's emotional manipulation and pressuring tactics. Stephanie also clarified that the level of involvement the Nelsons had in the Evanses' lives was because the Nelsons would often invite themselves or simply assume they had been invited when they had not. Stephanie and Brian did not want to "see their children go through the same emotional roller coaster that Stephanie" had experienced. The stated goal of the Evanses was to "protect *their children* from anyone, <u>even family members</u>, who use manipulation, control, and bribery as a way of influencing people around them." (Emphasis in original.)

Before the first child, C.E., was born, the Evanses resided in a rental property but were interested in buying a home. The housing market in California exceeded what the Evanses could afford, so the Nelsons offered to help the Evanses purchase a home by splitting the cost. A home was eventually purchased in the Nelsons' name only, even though the families agreed that each shared a one-half interest in the home. After a few years, the Evanses were able to transfer the mortgage to their names, but agreed that the Nelsons were still one-half owners. In 2015, the Evanses made the decision to sell the home and move to Idaho because they did not want to raise their family in southern California. The Nelsons did not receive this news well, to say the least; Linda began sobbing and shouting and told Stephanie that she would do everything in her power

to prevent them from moving out of California. Dennis, for his part, was shocked at the news. However, he was mostly concerned about recouping his investment in the house.

The Nelsons spent several weeks attempting to dissuade the Evanses from selling the home and moving to Idaho, as they thought they would be unable to recover their investment and would be forced to sell the property at a loss. The Evanses insisted on selling and secured a buyer for the home without informing the Nelsons. In response, the Nelsons filed a *lis pendens* on the home and a complaint to quiet title to the home in order to prevent its sale. Eventually, the families reached an agreement by which the house would be sold and the Nelsons and Evanses would equally split the loss on the property. The Nelsons then dismissed their quiet title action as a result.[3]

The Evanses then moved to Idaho and informed the Nelsons that they were terminating all contact between the Nelsons and the Evanses' children. The Nelsons attempted to make contact through several means over the course of the next year, without success. After hiring an attorney to contact the Evanses on their behalf, the Nelsons decided to initiate a formal legal action by filing a petition for visitation.

### B. Procedural History

In April of 2017, the Nelsons filed a petition in Idaho magistrate court seeking grandparent visitation. The Nelsons extensively outlined their relationship with the Evanses in their petition. The Nelsons cast their relationship with their granddaughters in a positive light. They maintained that the Evanses "unreasonably and without cause denied the grandchildren access to their grandparents." The Nelsons asserted a common law cause of action and a cause of action on behalf of the granddaughters,[4] in addition to claiming that Idaho Code section 32-719 entitled them to continue their relationships with the granddaughters.

The following month, the Evanses filed their answer and counterclaim. The Evanses disputed the Nelsons' version of events, alleging that Linda in particular was emotionally manipulative of Stephanie and pressured Stephanie into allowing the Nelsons' extensive involvement in the girls' lives that was unwanted by the Evanses. The Evanses counterclaimed for attorney fees. In October of 2017, the Evanses filed a motion to dismiss or in the alternative a

---

[3] After the trial before the magistrate court in Idaho, the court found that the Evanses never intended to sell the home without splitting any profit or loss with the Nelsons.

[4] Importantly, the magistrate court dismissed the Nelsons' cause of action which asserted injury on behalf of their granddaughters, concluding that they did not have standing to bring such a claim. The granddaughters are not parties to this litigation.

motion for summary judgment, arguing that the Nelsons lacked standing, failed to state a claim for relief, and that Idaho Code section 32-719 was unconstitutional. The Nelsons opposed this motion, and filed an affidavit of Dr. Mary Dietzen, a psychologist, and an affidavit of counsel, which had attached to it copies of both Brian's and Stephanie's deposition testimony.

At the hearing on summary judgment, the magistrate court first concluded that there was "no authority to allow for a common law cause of action for grandparents seeking visitation from an intact marital parental relationship where there are no allegations that the children have been abandoned, that the [biological] parents are unfit[,] or that the children have been in the grandparent's [sic] custody for an appreciable period of time." The magistrate court next concluded that the Nelsons had no standing to assert a cause of action on behalf of their grandchildren. Finally, regarding standing, the magistrate court concluded that Idaho Code section 32-719 "does not provide an independent cause of action outside of a divorce or custody proceeding."

The magistrate court alternatively concluded that, "even were the court to have found standing, there is not a sufficiently pled and legally supportable cause of action under the unique circumstances of this case to permit the matter to go forward." As a result, the magistrate court granted the Evanses' motion to dismiss based on lack of standing and alternatively granted the motion for summary judgment as well. The Nelsons appealed the magistrate court's decision to the district court.

The district court affirmed the magistrate court's conclusions in all respects. The Nelsons again appealed, this time to the Idaho Supreme Court. This Court, which was required to view all inferences in favor of the Nelsons, reversed the magistrate court's decision, first concluding that "Idaho's grandparent visitation statute plainly allows the Nelsons to petition the court for reasonable visitation regardless of whether there is a pending divorce action." *Nelson v. Evans*, 166 Idaho 815, 820, 464 P.3d 301, 306 (2020) (*Nelson I*). This Court next concluded that the "district court erred in affirming the magistrate court's grant of summary judgment for the Evanses because there is a genuine issue of material fact as to whether the Evanses' decision to terminate all contact between the Nelsons and their children was in their children's best interests" *Id.* at 821, 464 P.3d at 307. This Court remanded the case, instructing the lower court to hold an evidentiary hearing on the merits of the Nelsons' petition. *Id.* at 824, 464 P.3d at 310. The constitutionality of

5

Idaho Code section 32-719 was not before the Court in *Nelson I. Id.* at 820, 464 P.3d at 306 ("We initially note that the constitutionality of section 32-719 is not at issue on appeal.").

On remand, the Evanses filed a "Motion to Determine I.C. § 32-719 Unconstitutional and Dismiss and Decline Jurisdiction Under the UCCJEA."[5] In that motion, the Evanses asserted that section 32-719 was unconstitutional, both on its face and as applied, because it did not pass strict scrutiny. The Evanses then sought to transfer jurisdiction to North Carolina, arguing that Idaho was an inconvenient forum because the Evanses had just moved to North Carolina and the Nelsons still resided in California. The magistrate court declined to relinquish jurisdiction in favor of North Carolina, concluding that the litigation had been ongoing in Idaho for several years and changing venue so late in the case would result in a "miscarriage of justice." Next, the magistrate court concluded that Idaho Code section 32-719 was constitutional, both on its face and as applied to the Evanses.

The parties then began preparing for the evidentiary hearing on the Nelsons' petition. A three-day trial was held July 6 through July 8, 2021. During trial, Linda, Dennis, Stephanie, and Brian each testified. Additionally, the Nelsons called two doctors to the stand: Dr. Lori Thomas, a therapist specializing in children and reunification therapy; and Dr. Mary Dietzen, a therapist who works with children and families. Thomas and Dietzen testified that it is generally in the best interests of grandchildren to have a relationship with their grandparents. Neither Thomas nor Dietzen were intimately familiar with the facts of the case and neither had interviewed the parties or the grandchildren.

The magistrate court issued a lengthy memorandum decision on August 2, 2021. The magistrate court acknowledged that the Nelsons had inserted themselves into the Evans family to an "exorbitant" extent, and concluded that the Nelsons had disregarded the wishes of the Evanses on many occasions regarding how the Evanses wanted to raise their children. Next, the magistrate court found that Stephanie and Brian were "clearly [] fit and proper parents and the decisions that they make are accorded the Constitutional presumption that they are in the best interests of the children." Next, the magistrate court stated that Linda's behavior was "clearly not in the best interests of the grandchildren and that it undermine[d] the parents in the eyes of the children." The magistrate court made several additional findings that Brian's and Stephanie's concerns about the girls' level of involvement with the Nelsons had merit.

---

[5] Uniform Child Custody Jurisdiction and Enforcement Act.

6

The magistrate court then took issue with *how* the Evanses went about severing their daughters' relationships with the Nelsons:

> The Evanses were right to be concerned. But the real question is whether they had conveyed that concern sufficiently without qualification to the Nelsons to hold them accountable for their failure to abide by [the Evanses'] wishes. They [the Evanses] did not do so clearly enough, but rather sent conflicting signals.

As such, the magistrate court concluded that the Nelsons had "carried their burden of proof by clear and convincing evidence that the Evanses' termination of **all** contact between the Nelsons and the grandchildren was not in the best interests of their grandchildren." (Emphasis in original.) The magistrate court continued, "With absolute conviction this court finds that any significant visitation is just not in the best interests of the children when the Nelsons undermined the very cornerstone of the [c]onstitutionally protected family dynamic and in the process damaged their grandchildren."

Despite finding the Nelsons had harmed the grandchildren by acting in the way that they had, the magistrate court then ordered visitation with the following conditions:

> Prior to **ANY** contact/visitation with their granddaughters the Nelsons must engage in counselling with a certified counsellor who has never counselled any members of the Nelson family, designed to help them address the importance of respecting boundaries, to eliminate any manipulation and to respect the fundamental rights fit parents have to nurture and raise their children as they deem appropriate. The Nelsons must provide to the counsellor this court's written decision and send to the Evanses documentation from the counsellor that the Nelsons have appropriately addressed the issues set forth in the decision.
>
> **Only after such certification has been received by the Evanses may the Nelsons have any contact with their granddaughters.**
>
> Reunification therapy is not needed, required[,] nor in the minor children's best interests.

(Emphasis in original.)

The magistrate court then awarded the Nelsons the ability to call, send gifts, and visit in person as determined by the court. The magistrate court entered a judgment to that effect and attached a formal visitation schedule. The Evanses timely appealed. The National Association of Parents dba ParentsUSA (ParentsUSA) moved for leave to file an amicus brief, which this Court granted.

7

## II. STANDARD OF REVIEW

This Court reviews constitutional questions, which are pure questions of law, de novo. *Brockett Co., LLC v. Crain*, 168 Idaho 375, 380, 483 P.3d 432, 437 (2021). Factual determinations will be upheld so long as they are supported by substantial and competent evidence. *Leavitt v. Leavitt*, 142 Idaho 664, 668, 132 P.3d 421, 425 (2006).

Decisions implicating parental rights are subject to a showing of clear and convincing evidence, or a showing that the thing to be proven is "highly probable or reasonably certain." *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Grandparent visitation "decisions made pursuant to I.C. § 32–719 are subject to the abuse of discretion standard of review." *Leavitt*, 142 Idaho at 668, 132 P.3d at 425.

> When this Court reviews an alleged abuse of discretion by a trial court the sequence of inquiry requires consideration of four essentials. Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

## III. ANALYSIS

As a preliminary matter, we note that this appeal comes to us in a significantly different procedural posture than *Nelson I* did. In *Nelson I*, we were deciding the narrow question of whether the Nelsons' petition for visitation could survive summary judgment. As such, we were required to construe all inferences in favor of the non-moving party, the Nelsons. Here, however, the case comes to us on appeal after a trial on the merits in which the facts of the case were developed through the crucible of zealous advocacy. Furthermore, at this juncture, we are not required to draw inferences in favor of either party, rather we owe deference to the factfinder if the finding is supported by substantial and competent evidence.

### A. Idaho Code section 32-719 is facially unconstitutional.

The Evanses first assert that Idaho Code section 32-719 is facially unconstitutional. At the outset, the Evanses preemptively address their ability to raise this issue on appeal. Below, the Nelsons asserted that the Evanses waived their argument that section 32-719 is unconstitutional because they had not raised it as an issue in *Nelson I*. Because of the procedural posture of this case, the magistrate court concluded that the Evanses were not required to raise their constitutional

argument until this current appeal. The Nelsons do not dispute this in their Respondents' Brief. As such, the Evanses have properly preserved and raised their argument that Idaho Code section 32-719 is unconstitutional.

The primary authority on grandparent visitation is the United States Supreme Court case *Troxel v. Granville*, 530 U.S. 57 (2000). In *Nelson I*, this Court set forth the three "constitutional constraints on the application of grandparent visitation statutes" defined in *Troxel*:

> (1) there is a presumption that fit parents act in the best interests of their children; (2) the court must accord "special weight" to the fit parent's decision to limit or deny grandparent visitation; and (3) the court may not "infringe on the fundamental right of parents to make child rearing decisions simply because [it] believes a 'better' decision could be made."

166 Idaho at 822, 464 P.3d at 308 (quoting *Troxel*, 530 U.S. at 68–73). This Court further acknowledged that Idaho has codified the principles set forth in *Troxel* in Idaho Code sections 32-1010–1013. *Id.*

*Troxel* involved Washington State's non-parent visitation statute, which allowed "any person" to petition for visitation of a child at "any time." 530 U.S. at 61. The statute also imposed a best interests of the child standard. *Id.* Despite the three, well-recognized principles set out in *Troxel* (and described in *Nelson I*), the case fractured the U.S. Supreme Court, resulting in a plurality opinion and several concurrences and dissents. Justice O'Connor wrote for a four justice plurality, which was joined by Chief Justice Rehnquist, Justice Ginsburg, and Justice Breyer. In concluding that the Washington statute was unconstitutional as applied, the plurality noted that the statute was "breathtakingly broad." *Id.* at 67. The plurality noted that the operation of the Washington statute effectively gave no deference to a fit parent's decision regarding the best interests of his or her child. *Id.* Another problem with the statute noted by the plurality was that it "gave no special weight at all" to the parent's determination of her children's best interests. *Id.* at 69. Instead, the trial court had placed the burden on the parent to *disprove* that visitation would be in the best interests of her children. *Id.* This error, Justice O'Connor concluded, "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child." *Id.* As a result, the plurality opinion held that the Washington statute violated due process rights afforded to fit parents. *Id.* at 72–73.

Justice Souter wrote separately but concurred in the judgment. *Id.* at 75 (Souter, J., concurring in the judgment). Because he did not "question the power of a State's highest court to construe its domestic statute and to apply a demanding standard when ruling on its facial

constitutionality," Justice Souter would have simply affirmed the Supreme Court of Washington's decision that its visitation statute was unconstitutional. *Id.* at 79 (Souter, J., concurring in the judgment). Justice Thomas similarly concurred in the judgment, writing separately to note that he would apply strict scrutiny to infringements upon fundamental rights: "Here, the State of Washington lacks even a legitimate governmental interest—to say nothing of a compelling one— in second-guessing a fit parent's decision regarding visitation with third parties. On this basis, I would affirm the judgment below." *Id.* at 80 (Thomas, J., concurring in the judgment). Justices Stevens, Scalia, and Kennedy each filed their own dissenting opinions. *See id.* at 80, 91, 93; *see also Doe v. Doe*, 172 P.3d 1067, 1072 (Haw. 2007) (discussing each separate opinion in *Troxel*).

The principles set forth by the plurality in *Troxel* have been adopted as statute in Idaho. Idaho Code sections 32-1010–14 make up the Idaho Parental Rights Act (the Act). *See* I.C. §§ 32-1010–14. The Act sets forth a parent's fundamental right in the care, custody, and control of his or her children which is rooted in the due process clause:

> (2) The interests and role of parents in the care, custody and control of their children are both implicit in the concept of ordered liberty and deeply rooted in our nation's history and tradition. They are also among the unalienable rights retained by the people under the ninth amendment to the constitution of the United States.
>
> (3) The interests of the parents include the high duty and right to nurture and direct their children's destiny, including their upbringing and education.
>
> (4) The state of Idaho has independent authority to protect its parents' fundamental right to nurture and direct their children's destiny, upbringing and education.
>
> (5) The protections and rights recognized in sections 32-1011 through 32-1014, Idaho Code, are rooted in the due process of law guaranteed pursuant to section 13, article I, of the constitution of the state of Idaho.

I.C. § 32-1010(2)–(5); *see also* I.C. § 32-1011. In addition, the Act provides that "[g]overnmental efforts that restrict or interfere with these fundamental rights are only permitted if that restriction or interference satisfies the strict scrutiny standard provided in section 32-1013, Idaho Code." I.C. § 32-1010(6). In turn, section 32-1013 describes the strict scrutiny standard and provides, in relevant part, that

> (1) [n]either the state of Idaho, nor any political subdivision thereof, may violate a parent's fundamental and established rights protected by this act, and any restriction of or interference with such rights shall not be upheld unless it demonstrates by clear and convincing evidence that the restriction or interference is both:
>
> > (a) Essential to further a compelling governmental interest; and

(b) The least restrictive means available for the furthering of that compelling governmental interest.

I.C. § 32-1013(1)(a)–(b).

Idaho's grandparent visitation statute provides that "[t]he district court may grant reasonable visitation rights to grandparents or great-grandparents upon a proper showing that the visitation would be in the best interests of the child." I.C. § 32-719. In *Nelson I*, we determined that, despite section 32-719's location in the same statutory section as the divorce code, the statute does not limit when a grandparent or great-grandparent may petition for visitation. 166 Idaho at 821, 464 P.3d at 307. In other words, the statute does not limit petitions for visitation to divorce or custody actions. *Id.*

Aside from our prior decision in *Nelson I*, Idaho Code section 32-719 has rarely been analyzed in detail. In *Leavitt v. Leavitt*, this Court held as a matter of a first impression that "visitation decisions made pursuant to I.C. § 32-719 are subject to the abuse of discretion standard of review." 142 Idaho at 668, 132 P.3d at 425. In *Leavitt*, we also considered the applicable burden of proof on the party seeking visitation. *Id.* at 670, 132 P.3d at 427. Because the interest of parents in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court of the United States, this Court concluded that those seeking to establish a right to visitation would need to do so via "the clear and convincing standard of proof[.]" *Id.* (quoting *Troxel*, 530 U.S. at 64 (O'Connor, J., plurality opinion)).

The *Leavitt* Court also clarified that Idaho Code section 32-717, which sets forth several factors regarding the best interests of the child, was not applicable to a dispute between a parent and grandparent because section 32-717 "applies to custody disputes between *equal and competing* fundamental interests," i.e., two parents. *Id.* at 671, 132 P.3d at 428 (italics added). Notably, the father of the child in *Leavitt* sought a determination of the constitutionality of section 32-719, but this Court declined to engage in that analysis because it had already determined that the magistrate court had not abused its discretion in declining to award a grandparent visitation, citing the constitutional avoidance doctrine. *Id.* (citing *Poffenroth v. Culinary Workers Union Local No. 328*, 71 Idaho 412, 232 P.2d 968 (1951)).

Next, in *Overholser v. Overholser*, this Court mentioned section 32-719 in passing, referring to it as one of Idaho's "'keys to the courthouse,' . . . protecting both the parents' and children's rights in different ways." 164 Idaho 503, 508, 432 P.3d 52, 57 (2018). The Court in *Overholser* observed:

> In examining whether a state statute infringes on parental rights to manage the care, custody, and control of their children, *a court should narrowly construe nonparental custody and visitation statutes*, as well as afford the parents' wishes and decisions "special weight" in determining the child's best interests. After all, there is "the traditional presumption that a fit parent will act in the best interest of his or her child."

*Id.* (quoting *Troxel*, 530 U.S. at 68–73) (citation omitted, italics added).

The Evanses and Nelsons also briefly discuss *Stockwell v. Stockwell*, a 1989 case which involved the rights of a non-biological father to a child he had raised for several years. 116 Idaho 297, 298, 775 P.2d 611, 612 (1989). *Stockwell* established that in disputes between a parent and a non-parent, "Idaho [c]ourts apply a presumption that a parent should have custody as opposed to other lineal or collateral relatives or interested parties." *Id.* at 299, 775 P.2d at 613. "This presumption operates to preclude consideration of the best interests of the child *unless* the nonparent demonstrates either that the parent has abandoned the child, that the parent is unfit or that the child has been in the nonparent's custody for an appreciable period of time." *Id.* (italics added).

Because Idaho case law is so limited on the constitutionality of grandparent visitation rights, it is helpful to look to other jurisdictions. A 50-state survey conducted and published in 2020 provides a concise, yet enlightening, look at the state of grandparent visitation across the nation. *See* Sarah J.M. Cox, *Grandparent and Third-Party Visitation Rights: A 50 State Survey*, 40 CHILD. LEGAL RTS. J. 76 (2020). Most states have a grandparent visitation statute or judicial rule in place, but these laws vary in terms of who can petition for visitation and under what circumstances. *See id.* Seven states that provide for grandparent visitation exempt so-called "intact families" from petitions for visitation from grandparents. *See, e.g.*, *id.* at 80–92. Intact families are typically defined as a conventional nuclear family where the parents are married and are the biological parents to their children. *See id.; see also Nelson I*, 166 Idaho at 820 n.4, 464 P.3d at 306 n.4. The Evanses provide a ready example of an intact family.

Several other states also limit the ability of grandparents to seek visitation to situations when the parents are divorced, at least one (but perhaps both) of the parents is deceased, a child was born out of wedlock, an action for termination of parental rights is pending, or one or both parents is in a vegetative state. *See* Cox, *supra*, at 79–97. The most common limitations appear to be when one of the parents is deceased, or where the parents are divorced or are seeking a divorce and a custody action arises as a result. *Id.*

12

Because Idaho Code section 32-719 is not limited to divorce cases or non-intact families, Idaho is in the minority regarding under what circumstances grandparents may seek visitation. The broad sweep of section 32-719 is contrary to this Court's recent statement that courts should "*narrowly* construe nonparental custody and visitation statutes." *Overholser*, 164 Idaho at 508, 432 P.3d at 57 (italics added).

According to Cox's 50-state survey, nine states have declared their version of a grandparent visitation statute unconstitutional, either facially, as applied, or in part. Cox, *supra*, at 82–95 (Georgia, Hawaii, Kansas, Kentucky, Minnesota, New Jersey, Ohio, South Dakota, and Utah). One notable case is *Doe v. Doe*, in which the Hawaii Supreme Court determined that its grandparent visitation statute was unconstitutional because it did not survive strict scrutiny. 172 P.3d 1067 (Haw. 2007). Hawaii's grandparent visitation statute was similar to Idaho Code section 32-719 in that it did not restrict the circumstances under which a petition for visitation could be filed and only imposed one substantive requirement: that visitation be in the best interest of the child. Haw. Rev. Stat. Ann. § 571-46.3. It provided, in relevant part:

> A grandparent or the grandparents of a minor child may file a petition with the court for an order of reasonable visitation rights. The court may award reasonable visitation rights provided that the following criteria are met:
>
>> (1) This State is the home state of the child at the time of the commencement of the proceeding; and
>>
>> *(2) Reasonable visitation rights are in the best interests of the child.*

*Id.* (Italics added.)

In *Doe*, the mother and father of a child divorced, and a year later the child's grandmother petitioned for visitation. 172 P.3d at 1069. The constitutionality of Hawaii Revised Statutes section 571-46.3 was squarely before the Hawaii Supreme Court. *Id.*; Haw. Rev. Stat. Ann. § 571.46.3. First, the court discussed *Troxel* at length, analyzing the plurality and each concurring or dissenting opinion in detail. *Id.* at 1071. The court determined that Hawaii's grandparent visitation statute could be reasonably interpreted to conform to *Troxel's* minimum requirements. *Id.* at 1076. Specifically, the court concluded that the "best interests of the child" language in the statute required "the family court to give 'special weight' to (i.e., uphold a rebuttable presumption in favor of) the visitation decisions of a custodial parent whose fitness has not been challenged." *Id.* at 1077.

Next, however, the court considered section 571-46.3 with regard to the due process liberty interest in rearing children. *Id.* The court acknowledged the clear consensus that rearing children—making decisions regarding their care, custody, and upbringing—is a fundamental liberty interest. *Id.* Because the statute implicated that interest, it was subject to strict scrutiny, meaning the law had to be narrowly tailored to serve a compelling governmental interest. *Id.* at 1078. The Hawaii Supreme Court looked to other jurisdictions to determine what type of compelling state interest would be served by allowing grandparent visitation over the wishes of a fit parent. *Id.* at 1079. The court noted that "other jurisdictions have held that the strict scrutiny inquiry is satisfied only where denial of visitation to the nonparent third party would result in significant harm to the child." *Id.* (citing nine cases holding the same).

The court agreed with imposing a so-called "harm requirement," holding that "proper recognition of parental autonomy in child-rearing decisions requires that the party petitioning for visitation demonstrate that the child will suffer significant harm in the absence of visitation before the family court may consider what degree of visitation is in the child's best interests." *Id.* at 1079–80. Finally, the court concluded that "reading in a 'harm to the child' standard goes beyond interpretation and essentially constitutes judicial legislation" because such a requirement could not be read into the plain language of the statute. *Id.* at 1080. For that reason, the Hawaii Supreme Court ruled that the grandparent visitation statute was unconstitutional as written. *Id.*

Here, the Evanses assert that Idaho Code section 32-719 is unconstitutional in all its applications, i.e., that it is facially unconstitutional. The Evanses first contend that absent a showing of harm to the children in denying visitation, there is no compelling governmental interest furthered by section 32-719. Pointing to *Meyer v. Nebraska*, 262 U.S. 390 (1923), *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Evanses assert that the United States "Supreme Court has never tolerated interference with parental rights in the absence of a showing of harm or, at times, a 'significant social burden.'"

Notably, the Evanses concede that if this Court interprets section 32-719 to include a harm requirement, then the statute would be supported by a compelling state interest. The Evanses next contend that even if section 32-719 serves a compelling state interest, it is not narrowly tailored to further that interest because it is unconstitutionally broad. The Evanses point to this Court's decision not to impose a standing requirement in *Nelson I* to argue that section 32-719 is too broad to pass constitutional muster.

14

In response, the Nelsons assert that section 32-719 is facially constitutional because it can be read narrowly. The Nelsons posit that if the harm standard were adopted, it would result in "the narrowest possible interpretation of Idaho Code section 32-719, as it would do away with the vast majority of grandparent visitation cases in Idaho. That is clearly a policy decision which the State Legislature should make."

As a preliminary matter, we note that, as a matter of practice, we are reluctant to pass on the constitutionality of legislative acts unless necessity requires us to do so. *Leavitt*, 142 Idaho at 671, 132 P.3d at 428. However, we have already exercised constitutional avoidance of Idaho's grandparent visitation statute in *Leavitt*, where we concluded that, because the case could be resolved on other grounds, "we need not consider Leavitt's challenge to the constitutionality of I.C. § 32-719." *Id.* at 671, 132 P.3d at 428. The Evanses squarely present the constitutionality of section 32-719 to us in this case. Consequently, it is this Court's duty to determine whether section 32-719 violates the Evanses' fundamental, constitutional right to parent.

Statutes are generally presumed to be constitutional, and a party challenging the constitutionality of a statute "must overcome a strong presumption of validity." *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 68, 28 P.3d 1006, 1011 (2001). However, "[w]hen a statute infringes on a fundamental right or a suspect class, the presumption is that the statute is invalid" unless it can be shown that "the statute is necessary to serve a compelling state interest." *Id.* (citing *Heller v. Doe*, 509 U.S. 312 (1993) ("A classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.")). As such, section 32-719 is presumed to be invalid unless the Nelsons can demonstrate that it survives strict scrutiny.

It is well established that "[p]arents have a fundamental right to maintain a familial relationship, and to the 'custody, care and control' of their children; this right is protected by the Fourteenth Amendment." *In re Termination of Parental Rts. of Doe*, 155 Idaho 896, 902, 318 P.3d 886, 892 (2014). Because Idaho Code section 32-719 seemingly allows grandparents to seek visitation over the objection of fit parents, the fundamental right to parent is implicated. It is undisputed by the parties that strict scrutiny applies. Moreover, Idaho Code section 32-1013 mandates that any law restricting or interfering with the fundamental right to parent satisfy strict scrutiny: such laws are presumed invalid unless they are both (1) "essential to further a compelling government interest," and (2) "the least restrictive means available for the furthering of that compelling governmental interest." I.C. § 32-1013(1)(a)-(b). Therefore, to show that Idaho Code

15

section 32-719 meets the constraints of strict scrutiny, the Nelsons must establish that section 32-719 both furthers a compelling government interest and is narrowly tailored to further that interest.

At the outset, we decline to impose a "harm" standard into the plain and unambiguous language of section 32-719. As the Hawaii Supreme Court concluded in *Doe*, reading into section 32-719 a "harm" standard when the statutory plain language only requires a "best interests" analysis would likely amount to judicial legislation. *See* 172 P.3d at 1080. This Court interprets statutes as they are written, bearing in mind the power to modify or correct statutes lies with the legislature. *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011). We previously concluded that section 32-719 was unambiguous. *Nelson I*, 166 Idaho at 821, 464 P.3d at 307. Consequently, the next inquiry is whether section 32-719, as written, can survive strict scrutiny.

1. <u>Idaho Code section 32-719 does not further a compelling state interest as written.</u>

The Nelsons posit that this Court should recognize the best interests of minor children as a compelling state interest. Some examples of compelling government interests include eradicating discrimination on the basis of race, protecting children from injury, protecting children from exposure to sexually explicit television broadcasts, and other public health and safety concerns. *See, e.g.*, Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1321 (2007); Stephen A. Siegel, *The Origin of the Compelling State Interest Test and Strict Scrutiny*, 48 AM. J. LEGAL HIST. 355, 380 (2006). Section 32-719 allows grandparent visitation simply if it would be in the best interests of the children. A bare "best interests" standard is unlike other compelling interests previously defined by the United States Supreme Court or this Court, especially in light of its existing interference with the fundamental liberty interests possessed by fit parents.

For example, in *Prince v. Massachusetts*, the United States Supreme Court upheld a child labor law that interfered with parental rights because preventing psychological or physical injury was a compelling state interest. 321 U.S. 158, 170 (1944). Here, ensuring that parental decisions regarding visitation are in the best interests of a child cannot be said to rise to the same level as that of protecting children from harm by prohibiting child labor. As discussed above, by reading a "harm requirement" into section 32-719 would the statute serve a compelling state interest. Having declined to do so, we conclude that section 32-719 does not serve a compelling state interest. *See Troxel*, 530 U.S. at 80 (Thomas, J., concurring in the judgment) ("Here, the State of Washington

16

lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties.").

2. Idaho Code section 32-719 is not narrowly tailored.

The Evanses also argue that because this Court in *Nelson I* concluded that section 32-719 had no standing requirement, there are no procedural safeguards in place preventing otherwise fit parents from being hauled into court by overzealous grandparents. As discussed above, Idaho Code section 32-719 broadly allows grandparents to seek visitation at *any* time. *Nelson I*, 166 Idaho at 821, 464 P.3d at 307. Idaho's statute is substantially similar to the Washington statute invalidated by the *Troxel* Court, with one notable exception. Washington's statute used "any person" instead of "grandparents or great-grandparents." *Troxel* noted that the Washington statute was "breathtakingly broad." 530 U.S. at 67. Here, although somewhat narrower than Washington's statute, section 32-719 nonetheless does not restrict the circumstances under which grandparents or great-grandparents are allowed to seek visitation (such as divorce or custody actions). For this reason, we conclude it is not narrowly tailored. Furthermore, the statute merely requires a court to engage in a bare best-interests analysis, without offering further guidance on how to engage in that analysis without second-guessing fit parents' decisions. *Cf. Leavitt*, 142 Idaho at 671, 132 P.3d at 428 (holding that the best interest factors set forth in Idaho Code section 32-717 do not apply to grandparent visitation cases). Because section 32-719 does not limit standing or provide meaningful guidance for how to apply the best interests test, it is not narrowly tailored. As a result, section 32-719 does not pass constitutional muster. We hold that Idaho Code section 32-719 is facially unconstitutional.

**B. Neither party is awarded attorney fees on appeal.**

The Evanses seek attorney fees on appeal pursuant to Idaho Code section 12-121. The Evanses allege that the Nelsons have "unreasonably defended the Evanses' attempts to bring this case in front of this Court," because the Nelsons have substantively opposed every motion brought by the Evanses since the final judgment was entered by the magistrate court.

The Nelsons first argue in response that the Evanses have waived their right to seek attorney fees because they did not cite the full text of Idaho Code section 12-121 nor supporting case law. The Nelsons also assert that the Evanses have waived their right to costs because they failed to "make any mention of the relevant standards for awarding costs." The Nelsons finally contend that the Evanses have pursued their proposed harm standard "frivolously, unreasonably,

17

or without foundation," entitling the Nelsons to attorney fees pursuant to Idaho Rule of Family Law Procedure 902(b).

Idaho Code section 12-121 provides: "In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Idaho Appellate Rule 40 awards costs to the prevailing party on appeal as a matter of course; costs need not be raised in an appellate brief to be awarded. *See* I.A.R. 40. Idaho Rule of Family Law Procedure 902(b) provides for an award of attorney fees pursuant to Idaho Code section 12-121.

Although we conclude that the Evanses have not waived their claim for attorney fees pursuant to Idaho Code section 12-121, we decline to award attorney fees to either party. In *Nelson I*, this Court determined that the Nelsons were entitled to pursue visitation with their grandchildren and prove their case in court. Consequently, we cannot conclude the Nelsons defended this appeal frivolously, unreasonably, or without foundation. The Evanses, similarly, did not defend themselves or bring this appeal frivolously, unreasonably, or without foundation because they challenged the constitutionality of a statute and ultimately prevailed.

Finally, because they have prevailed, we award costs to the Evanses pursuant to Idaho Appellate Rule 40. Costs are awarded to the prevailing party as a matter of right; contrary to the Nelsons' assertion, a party is not required to request costs in their briefing on appeal. I.A.R. 40.

## C. The case is dismissed without being remanded.

Finally, the Evanses clarify that they are not seeking remand on appeal. Rather, the Evanses ask this Court to vacate the visitation order and dismiss the case to not "force the parties into additional litigation." The Evanses note that the *Troxel* Court and the Wisconsin Supreme Court have similarly followed this procedure. *See Matter of Visitation of A.A.L.*, 927 N.W. 2d 486, 501 (Wis. 2019). The Nelsons have not responded to the Evanses' requested remedy.

The *Troxel* Court concluded that there was "no reason to remand the case for further proceedings in the Washington Supreme Court." 530 U.S. at 75. The plurality acknowledged the substantial burden litigation places on a parent who has been forced into litigation by a nonparent: "As we have explained, it is apparent that the entry of the visitation order in this case violated the Constitution. We should say so now, *without forcing the parties into additional litigation that would further burden Granville's parental right*." *Id.* (italics added). Justice Kennedy also noted in his dissenting opinion that this type of litigation can be "so disruptive of the parent-child

18

relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated." *Id.* at 101 (Kennedy, J., dissenting); *see also Matter of Visitation of A. A. L.*, 927 N.W.2d 486, 501 (Wis. 2019) ("Based upon the record below, we decline to remand the case to the circuit court. The visitation order violated the constitutional rights of [the parents] and we decline to force the parties into additional litigation that would further burden [their] fundamental liberty interest in the care and upbringing of A.A.L.").

Because we have determined that Idaho Code section 32-719 is facially unconstitutional, the magistrate court's visitation order is reversed. We decline to remand the case for the magistrate court to do what we can do now on appeal—dismiss this case. We would be remiss to not mention the financial toll the Nelsons' petition has had on the Evanses. The Evanses testified at trial that this litigation (not including the prior lawsuit seeking to quiet title to their home in California) has resulted in a bill for attorney fees in excess of $50,000. The Nelsons' conduct in this case has placed a significant financial and emotional strain on Stephanie and Brian, and likely their three daughters as well. To remand the case at this juncture would do nothing more than require the Evanses to engage in additional litigation that would "further burden" their parental rights. *Troxel*, 530 U.S. at 75.

## IV. CONCLUSION

We hold that Idaho Code section 32-719, Idaho's grandparent visitation statute, is facially unconstitutional. As a result, the decision of the magistrate court is reversed, and the case is dismissed.

Chief Justice BEVAN, Justices BRODY, MOELLER and ZAHN CONCUR.

19